Chester L. **EDGERTON**, Petitioner,

v.

**STATE OF NORTH CAROLINA,**
Respondent.

Misc. No. 23.

United States District Court
E. D. North Carolina.*

Feb. 2, 1965.

---

* This petition, filed in the United States Court of Appeals for the Fourth Circuit, Misc. No. 23, was heard by an individual United States Circuit Judge and his order filed in the District Court pursuant to 28 U.S.C.A. § 2241.

HAYNSWORTH, Chief Circuit Judge.

Chester L. Edgerton, a North Carolina prisoner under a life sentence imposed in 1958 for first degree burglary, has submitted to a Judge of this Court a petition for a writ of habeas corpus.

In Edgerton v. State of North Carolina, 4 Cir., 315 F.2d 676, this Court remanded an earlier petition by the same prisoner to the United States District Court for the Eastern District of North Carolina for a plenary hearing. Judge Butler, after conducting a full hearing, denied the petition on May 25, 1964. No notice of appeal was filed, and the time therefor has expired. For that reason, I treat the handwritten application as an original petition for habeas corpus.

In 1958, Edgerton was indicted for rape and first degree burglary in Vance County, North Carolina. He entered a plea of guilty to the burglary charge, resulting in a mandatory life sentence [1], and the prosecutor agreed to an order of nolle prosequi on the rape charge.

After accepting the guilty plea, the sentencing court heard the following state's evidence: Luvinia Jordan testified that about midnight on the night in question she heard a knock at her door, asked who was there, and heard "Chester" in reply; she refused to let him in and later heard the screen being "prized" off the window. She shot through the glass window with a sawed-off .22 rifle, and Edgerton burst through the door, breaking the thumb-bolt latch. He was cut around the eyes, apparently from splintered window glass. While he was examining his injuries, she fled with a neighbor to the police station, leaving her six children within the house.

Rosa Mae Cute, the 7-year-old daughter of Luvinia Jordan, testified that Edgerton took her from her upstairs bedroom to that of her mother, removed her clothes and smelled them, laid her on the bed, and "put his self in [her] self."

The examining physician, Dr. R. G. Currin, Jr., testified that his examination of Rosa Mae Cute's sexual organ indicated that there had been "some penetration by something," but that entry of an adult male phallus was a physical impossibility. He testified that the girl was incapable of sexual intercourse with a grown man.[2]

---

1. N.C.Gen.Stat. § 15–162.1.

2. This may be a medical fact, but not a legal conclusion. As recognized by Judge Butler, "North Carolina has consistently held that there is sexual intercourse in the legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male." It is not necessary that the vagina be ac-

tually entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient. See State v. Jones, 249 N.C. 134, 105 S.E.2d 513 (1958).

Specifically, Dr. Currin testified that he "found some evidences of minor abrasions and excoriations, and some scratches about the vulva region of the vagina. On further examination, the vagina ap-

■ Judge Butler concluded that the evidence presented to the sentencing court established a prima facie case of first degree burglary and rape. The question of sufficiency of evidence is collaterally raised by the present petition, since Edgerton's main contention is that he was denied effective representation by counsel, his three court-appointed lawyers having recommended that he tender a guilty plea to the burglary charge, receive a mandatory life sentence and thus escape the gas chamber. Clearly if such advice was reasonable under the circumstances, Edgerton cannot complain. Judge Butler found that it was, and I agree. The advice was the product of careful investigation, and not an attempt by lawyers to escape the burdens of court-appointed criminal defense.

Upon adequate evidentiary basis, Judge Butler found that Edgerton's counsel interviewed the three law enforcement officers involved, questioned the physician who examined the infant prosecutrix, and heard the prosecutor question the little girl and her mother at a pre-trial interview, arranged at the request of counsel for the defense. At no time did Edgerton furnish counsel the names of any witnesses or offer "any plausible defense," and in addition, was "uncooperative and evasive." After hearing the evidence that the state planned to put on at the trial, the three lawyers were convinced that there was sufficient evidence to support a verdict of guilty on both the rape and burglary charges. As both were capital offenses, counsel arranged for the state to *nolle prosequi* the rape charge in exchange for a guilty plea to the first degree burglary charge, the state refusing to accept a plea to any lesser included offense. The District Judge found that the entire circumstances were explained to Edgerton, who thereafter entered voluntarily, though reluctantly, his plea of guilty to the burglary charge.

In his "Brief for Petitioner," counsel for Edgerton in the District Court stated that Edgerton's "present dilemma" is not the result of "lack of interest or ability" on the part of his trial counsel, but rather the unfortunate result of a "lack of communication" between counsel and Edgerton. Since he was "uncooperative and evasive," it appears that the lack of communication was the result of Edgerton's own attitude. The Constitution does not require that court-appointed counsel work miracles. Clearly, Edgerton was not denied the effective assistance of counsel in any legal sense.[3]

■ Edgerton's second contention is that immediately after counsel had been appointed, they approached Edgerton with a previously prepared guilty plea and urged him to sign it. The District Court found, however, and the record shows, that counsel were appointed on January 13, 1958, and that on January 15,

---

parently was not dilated past the size of approximately the little finger, obviously having not been penetrated by an adult phallus. On microscopic examination of scraping about the vagina and vulva region, we were unable to find any spermatazoon."

3. Judge Butler covered the issue well: "When petitioner's case came on for trial in January 1958, three experienced attorneys were assigned to represent him. They did not confront him with a previously prepared plea of guilty on the day of their assignment. In fact, when Edgerton eventually did sign the guilty plea, counsel had already obtained a continuance. Therefore, there was no exigency in which counsel lacked an opportunity to prepare a defense, and it does not follow that Edgerton signed the plea solely because of fear that no preparations had been made for his defense.
"Counsel made diligent inquiry into the circumstances, questioned all known witnesses, and talked at length with Edgerton. At no time did Edgerton give counsel the names of any witnesses or give them any indication of a plausible defense. He was evasive and uncooperative. Faced with the choice of going to trial for two capital felonies without a reasonable defense, or entering a plea of guilty to the burglary charge and thus being assured of avoiding the death penalty, counsel advised the latter, whereby the petitioner would receive a life sentence and become eligible for parole after ten years."

after Edgerton made the decision to plead guilty, the plea was typed by the court stenographer and submitted to Edgerton for his signature. A continuance had been granted counsel, and the signing was not psychologically coerced by lack of time to prepare an adequate defense.

Judge Butler found the above facts concerning the first two contentions after a full and fair evidentiary hearing. The treatment of Edgerton's untimely appeal as an original application presenting the same contentions does not, in these circumstances, require a second evidentiary hearing. Title 28 U.S.C.A. § 2244.

■ A third contention is that both the infant prosecutrix and her mother gave perjured testimony in the state court, which was manifestly inconsistent with the testimony given by these witnesses in the District Court. This claim is frivolous, however, for there is no allegation that the state had knowledge that the testimony was untrue. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791. Moreover, the inconsistencies, if any, are so slight as to be inconsequential and nonprejudicial.

■ Edgerton also contends that Luvinia Jordan perjured herself when she testified that he had been to her home only once, when, in fact, he had been there on many occasions, and had been intimate with her numerous times. Witnesses called by Edgerton in the District Court testified that he was a frequent visitor to the Jordan house. But a habeas corpus hearing is not a new trial. If Edgerton had a defense to the burglary charge, or evidence that his entry into the home was peaceful, he should have so informed trial counsel. But he did not; he originally denied being present at the Jordan home that night, and later told counsel that he was with companions, whom he could not identify, at a place, the location of which he had forgotten.

Edgerton also claims that E. A. Cottrell, the then sheriff of Vance County,

committed perjury both in the state court and the District Court, and that the perjury is established by the conflicting testimony of Luvinia Jordan and K. K. Roberson, a deputy sheriff. Sheriff Cottrell's testimony in the sentencing court was that he found the door of the allegedly burglarized dwelling "broken down," and he later testified in the District Court that the front door was "broken off" and "lying up against the house." Edgerton correctly points out that Luvinia Jordan testified in the sentencing court and in the District Court only that the "thumb-bolt" latch was broken. The deputy sheriff stated in the District Court that the latch had been broken and that "one hinge of the door was off." The testimony is slightly inconsistent, but the record shows that the deputy sheriff and Luvinia Jordan visited the home immediately after Edgerton's visit, whereas Sheriff Cottrell's investigation was made the morning after the burglary. I cannot see that this inconsistency denied Edgerton any constitutional right, for the other evidence of breaking, though more moderate, was sufficient to establish a prima facie case of burglary, and there is no reason to believe that the door was not further interfered with after the deputy and Luvinia Jordan had left.

■ Edgerton's contentions that he was illegally arrested and held from November 19, 1957, to January 13, 1958, without knowledge of the charges against him, and without counsel, are frivolous. The arrest was made pursuant to a warrant, and Sheriff Cottrell testified, with corroboration, that he informed Edgerton of the charges against him when he was arrested. And the record shows that Edgerton was present at a preliminary hearing held on December 6, 1957, at which he was represented by one T. P. Goldston, a lawyer employed by Edgerton's aunt. In any event, no confessions or admissions of any sort were made during Edgerton's confinement which render, necessarily, any allegations of unlawful detention irrelevant.

The petition will be filed in the District Court for the Eastern District of North Carolina at Raleigh, without prepayment of costs, but the same will be, and hereby is, dismissed as frivolous.